# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

_____ _____

CASE NO.:  16-10128-DD

_____

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLEE,

v.

ERICKSON MEKO CAMPBELL,

DEFENDANT-APPELLANT.

_____

## PRINCIPAL BRIEF OF THE APPELLANT

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION
CASE NO.: 3:14-CR-00046-CAR-CHW-1

_____

Jonathan R. Dodson
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 207-3443
Fax: (478) 207-3419
E-mail: jonathan_dodson@fd.org
Appellate Counsel for Mr. Campbell

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned appellate counsel of record for Defendant-Appellant, Mr. Campbell, in compliance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, certifies that the following listed persons and parties have an interest in the outcome of this case:

**Campbell, Erickson Meko**, Defendant-Appellant;

**Dodson, Jonathan R.**, Appellate Attorney for Defendant-Appellant, Mr. Campbell, Research & Writing Specialist for the Federal Defenders of the Middle District of Georgia, Inc. (adding appellate attorney for Mr. Campbell, Defendant-Appellant);

**Hunt, Christina L.**, Trial Attorney for Defendant-Appellant, Mr. Campbell, Executive Director for the Federal Defenders of the Middle District of Georgia, Inc.;

**Jarrett, Tamara A.**, Trial Attorney for Plaintiff-Appellee, United States of America, Assistant United States Attorney, Middle District of Georgia;

**Peterman, III, G.F.**, Acting United States Attorney, Middle District of Georgia;

**Royal, C. Ashley**, United States District Judge, Middle District of Georgia;

**Schieber, Michelle L.**, Appellate Attorney for Plaintiff-Appellee, United States of America, Assistant United States Attorney, Middle District of Georgia;

**Thorpe, Graham A.**, Trial Attorney for Plaintiff-Appellee, United States of America, Assistant United States Attorney, Middle District of Georgia;

**United States of America**, Plaintiff-Appellee;

**Vogelbaum, Martin J.**, Appellate Attorney for Defendant-Appellant, Mr. Campbell, *Former* Research & Writing Specialist for the Federal Defenders of the Middle District of Georgia, Inc.;

**Weigle, Charles H.**, United States Magistrate Judge, Middle District of Georgia; and

**Westbroek, Jared Scott**, Attorney for Defendant-Appellant, Mr. Campbell, Assistant Federal Defender for the Federal Defenders of the Middle District of Georgia, Inc.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. This case concerns an important Fourth Amendment issue which this Court has not squarely addressed: whether, in light of *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), a traffic stop that is measurably prolonged while an officer asks questions unrelated to its initial justification nonetheless passes muster if the overall process was "reasonable." The District Court concluded that *Rodriguez* did not affect this Circuit's rejection of a "bright-line no prolongation rule." *United States v. Griffin*, 696 F. 3d 1354, 1362 (11th Cir. 2012) (internal quotations omitted). But in *Rodriguez*, the Supreme Court rejected the Eighth Circuit's *de minimis* rule, suggesting that the Fourth Amendment requires a more meticulous review of a traffic stop to determine its permissible scope. Because this Court has not yet determined what, if any, effect *Rodriguez* had on the law of the Eleventh Circuit, this appeal warrants oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................... C1 of 2

STATEMENT REGARDING ORAL ARGUMENT .............................................. i

TABLE OF CONTENTS ......................................................................................... ii

TABLE OF AUTHORITIES .................................................................................. iv

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ........................................................................................................1

STATEMENT OF THE ISSUES ..............................................................................2

STATEMENT OF THE CASE ..................................................................................3

COURSE OF PROCEEDINGS AND DISPOSITION ..............................................4

STATEMENT OF THE FACTS ...............................................................................5

STANDARDS AND SCOPES OF REVIEW .........................................................12

SUMMARY OF ARGUMENT ..............................................................................13

ARGUMENT AND CITATIONS OF AUTHORITY ............................................15

   I.   OFFICER MCCANNON UNCONSTITUTIONALLY EXPANDED THE STOP WITHOUT JUSTIFICATION, CONTRAVENING *RODRIGUEZ V. UNITED STATES*, 135 S. CT. 1609 (2015) ...............................................................................15

   II.  MCCANNON DID NOT HAVE REASONABLE SUSPICION OR PROBABLE CAUSE TO STOP THE CAR BASED ON THE TURN SIGNAL BLINKING "TOO RAPIDLY." ..................................................................................24

CONCLUSION .......................................................................................................29

CERTIFICATE OF COMPLIANCE.......................................................................30

CERTIFICATE OF SERVICE ...............................................................................31

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Johnson*
   555 U.S. 323 (2009)................................................................ *passim*

*Barnett v. State*,
   620 S.E.2d 663 (Ga. Ct. App. 2005)................................................24

*Brinegar v. United States*,
   338 U.S. 160 (1949)......................................................................26

*Florida v. Royer*,
   460 U.S. 491 (1983) ................................................................ 19, 22

*Heien v. North Carolina*,
   135 S. Ct. 530 (2014)................................................ 14, 26, 27, 28

*Illinois v. Caballes*,
   543 U.S. 405 (2005)........................................... 15, 16, 20, 22

*Lancaster v. State*,
   582 S.E.2d 513 (Ga. Ct. App. 2003)................................................25

*Meuhler v. Mena*,
   544 U.S. 93 (2005).........................................................................22

*Navicky v. State*,
   537 S.E.2d 740 (Ga. Ct. App. 2000)................................................24

*Rodriguez v. United States*,
   135 S. Ct. 1609 (2015).............................................................. *passim*

*Stubbs v. State*,
   387 S.E.2d 619 (Ga. Ct. App. 1989)................................................24

*United States v. Alexander*,
   835 F. 2d 1406 (11th Cir. 1988) ......................................................12

*United States v. Brigham*,
   382 F. 3d 500 (5th Cir. 2009) ...................................................... 18, 19

*United States v. Griffin*,
   696 F. 3d 1354 (11th Cir. 2012) ....................................... i, 11, 20, 22

*United States v. Shabazz*,
   993 F. 2d 431 (5th Cir. 1993) ...............................................................18

*Warden v. Hayden*,
   387 U.S. 294 (1967)...............................................................................22

*Warren v. State*,
   561 S.E.2d 190 (Ga. Ct. App. 2002)........................................... 24, 25

## Statutes

18 U.S.C. § 3231 (2013) ...........................................................................1

18 U.S.C. § 922(g)(1)................................................................................3

18 U.S.C. § 924(a)(2)................................................................................3

28 U.S.C. § 1291 (2015) ...........................................................................1

O.C.G.A. § 40-8-26.......................................................................... *passim*

## Rules

11th Cir. R. 26.1-1 ........................................................................ C1 of 2

11th Cir. R. 32-4……….……………………………..……………….……….......30

Fed. R. App. P. 10(e)(2)(A) ...................................................................20

Fed. R. App. P. 26.1 ..................................................................... C1 of 2

Fed. R. App. P. 32(a)(7)(B)(i)..................................................................30

Fed. R. App. P. 32(a)(7)(C) ...................................................................30

## Other Authorities

Wayne R. LaFave,
  *The "Routine Traffic Stop" From Start to Finish: Too Much "Routine," Not
  Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1898 (Aug. 2004)..........17

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This is a direct appeal in a criminal case from the January 7, 2016, final judgment of the United States District Court for the Middle District of Georgia, Macon Division. R 56.[1] The district court had jurisdiction under 18 U.S.C. section 3231. Erickson Campbell filed a timely notice of appeal on January 12, 2016. R 61. This Court has jurisdiction based on 28 U.S.C. section 1291.

---

[1] The record is cited "R # at #."

## STATEMENT OF THE ISSUES

I.    Officer McCannon unconstitutionally expanded the stop without justification, contravening *Rodriguez v. United States*, 135 S. Ct. 1609 (2015).

II.   McCannon did not have reasonable suspicion or probable cause to stop the car based on the turn signal blinking "too rapidly."

## STATEMENT OF THE CASE

This criminal appeal arises from Appellant's conviction for possessing a firearm by a convicted felon, in violation of 18 USC sections 922(g)(1) and 924(a)(2), rendered by Judge C. Ashley Royal of the United States District Court for the Macon Division of the Middle District of Georgia.

## COURSE OF PROCEEDINGS AND DISPOSITION

A federal grand jury sitting in the Middle District of Georgia indicted Erickson Campbell with possessing a firearm after being convicted of a crime punishable by more than a year. R 1. He moved to suppress all evidence obtained as a result of his traffic stop. R 26. The District Court denied the motion. R 42. Campbell entered a guilty plea, reserving his right to appeal the court's denial of his motion. R 45, 47. The court sentenced him to 28 months in prison. R 56 at 2.

Appellant is not in federal custody, as the District Court granted him a $25,000 appeal bond. R 59.

## STATEMENT OF THE FACTS

**Evidence.** Deputy McCannon stopped Campbell's car for failing to maintain a lane and "because the blinker appeared to not be working correctly." R 32 at 12-13. He noticed the left turn signal was blinking "at a very rapid pace." *Id*. at 13. "Other than the rapid blinking," the bulb "appear[e]d to be working in terms of visibility." *Id*. at 15. McCannon had personally changed a couple hundred bulbs, and from his experience a rapidly blinking bulb indicates "you either have a bulb out, or you have one that's about to blow . . . ." *Id*. at 14. Nonetheless, he saw the turn signal blinking rapidly and understood it to mean the driver was changing lanes. *Id*. at 18.

McCannon also noticed the car cross the right fog line, so he activated the video camera affixed to his police cruiser's dashboard ("dash cam"), beginning a clock – visible on the lower right hand of the screen – at 0:00. *Id*. at 23, 27. McCannon stopped the car after he saw it "on the line" a second time as it took a "slight right-hand turn," *Id*. at 25.

He initiated the stop at 2:30 and approached the car at 3:27. *See* video.[2] After asking for Campbell's license and registration, McCannon investigated the

---

[2] The video of the stop is referenced in the exhibit list. R 37. The parties, judge and witness referred to the video at the suppression hearing, and the court cited the video in denying the motion. R 42 at 4 – 8, notes 2 - 13. Although it appears from the transcript that the parties did not formally move the video into evidence, the

turn signal. *See* video at 3:49-4:43. He then discussed "where he was going that weekend," and asked Campbell about his car. R 32 at 35; video at 4:44-5:09. When Campbell told him he was going to Augusta, he asked him what part of Augusta. *Id*. McCannon agreed these questions were not relevant to the reasons he stopped Campbell. R 32 at 35.

McCannon asked Campbell to get out of the car, then returned to his police car to get his citation book. *Id*. at 36. When the clock showed 5:27, McCannon was approaching his police car on foot. *Id*. at 27-28. At 5:53, he began writing Campbell two warnings. *Id*. at 28. McCannon used a standard citation form to write Campbell's warnings, but combined both warnings on one form, and wrote "warning" at the bottom. *Id*. at 37. To complete the form, he had to write the date, time, driver's license number, "information about the person," make and model of the car, and "what the warning is for." *Id*. at 38. He had completed "probably thousands" of citations. *Id*. at 37.

While filling out the information, McCannon asked Campbell questions. *Id*. at 39. When he did, he stopped writing and looked Campbell in the eyes. *Id*. at 41, 46-47. He told Campbell he knew a little bit about Augusta. *Id*. at 39. He asked him if he was taking some days off to go to Augusta. *Id*. He returned to his police car to get his coat. *See* video at 7:50-8:30. He asked him if he had any firearms. *Id*.

clerk certified and forwarded a supplemental record that included the video based on the parties' stipulation under Fed. R. App. P. 10(e)(2)(A). *See* R 73.

at 8:37. At 9:20 he asked Campbell when he last had a ticket. *Id*. At 9:43 he asked whether he had been arrested. *Id*. He quit writing to discuss Campbell's route with Deputy Paquette. *Id*. at 10:00-10:38. He stopped writing again to tell Campbell he was going to write both warnings on one citation form. *Id*. at 10:57. He again stopped writing to ask whether Campbell possessed any counterfeit merchandise in the car. *Id*. at 11:15. He asked about counterfeit shoes, purses, shirts, pirated CD's, pirated DVD's, illegal alcohol, marijuana, cocaine, meth, heroin, ecstasy, or dead bodies. *Id*. at 11:20-11:50.

McCannon acknowledged his questions were not relevant to the warnings he was writing. *Id*. at 44. But he asked them because Campbell seemed nervous, even after he was told he was only receiving warnings. *Id*. at 44-45. His hands were shaking when he gave McCannon his license, he kept looking towards his car, and did not make eye contact. *Id*. at 45, 46. However, it was cold that evening, and Campbell was not wearing his coat. *Id*. McCannon had made numerous arrests "from people from the Augusta area all the way up to New York" and knew that "Augusta was one time a big drug area, and there's a lot of crime in that area." *Id*. at 45. Paquette told McCannon that Campbell's destination "was a bad area, which I don't know because I'm not from Augusta, but he worked there in Augusta at one time." *Id*. at 46.

7

McCannon obtained Campbell's consent to search his car at 11:55. *Id*. at 30. He had not finished writing his warning. *Id*. Paquette began searching the car at 13:10, while McCannon completed the warning. *Id*. at 31. Campbell signed the warning at 13:41. *Id*. McCannon handed him the warning at 14:00. *Id*. at 33. The government proffered that officers found the gun at 19:56. *Id*. Campbell argued they found it during a second, unauthorized search. *Id*.

**District Court's Factual Findings**. The court found Officer McCannon observed Campbell cross the fog line, he turned on his dash cam, and the car crossed the fog line again. R 42 at 3. It found Campbell turned on the left signal, which blinked too fast. *Id*. McCannon pulled Campbell over, and when asking for his license, noticed Campbell was breathing heavily and shaking. *Id*. at 3-4. McCannon examined the other lights, before concluding the turn signal was "going bad," but announced he would not write Campbell a ticket. *Id*. at 4. At 1:55 into the stop, McCannon asked Campbell where he was going, how long he would be in Augusta, and whether he worked or had family there. *Id*. After Campbell answered these questions, McCannon asked him to stand beside his police car while he wrote his warnings. *Id*. at 5. He began writing at 3:17. *Id*. He spent thirty seconds putting on his jacket. *Id*. He reminded Campbell that his driver's license would expire at the end of the month. *Id*. He asked Campbell about his car, and where he had bought it. *Id*. Sergeant Paquette arrived at 3:28. *Id*. at 6.

8

McCannon asked Campbell when he got his last ticket. *Id*. When Campbell answered four years ago, McCannon asked dispatch for a driver's license check. *Id*. He asked Campbell if he had ever been arrested. *Id*. Campbell replied he was arrested for driving under the influence fifteen to sixteen years before. *Id*. McCannon then directed Paquette to question Campbell further about Augusta, since Paquette was from that area. *Id*. McCannon asked whether Campbell had in his car: counterfeit merchandise including purses, shoes, shirts, or bootleg CDs or DVDs, illegal alcohol, marijuana, cocaine, meth, heroin, ecstasy, or dead bodies. *Id*. at 7. At this point McCannon had spent 5 minutes 22 seconds writing the warning. *Id*. Of that time, the questions about contraband lasted 35 seconds. *Id*.

At this point, McCannon asked for and received consent to search Campbell's car. *Id*. Paquette "conducted a pat-down search" of Campbell, and began searching the car, while McCannon worked on the warnings. *Id*.

Deputy McCannon stopped the car at 2:55. *Id*. at 8, n.12,13. He began writing the warning at 5:48. *Id*. at n.10,11. He obtained consent to search at 11:58. *Id*. at n.10,12. And Campbell signed the warning at 13:34. *Id*. at n.13.

**District Court's Legal Conclusions**. The court found the "rapidly-blinking turn signal justified the stop," so it did not address whether the officer could have stopped Campbell based on his crossing the fog line. R 32 at 10. It found McConnell had probable cause to believe Campbell was violating O.C.G.A.

9

section 40-8-26 because the signal was not "in good working condition," and reasonable suspicion to investigate whether it was functioning properly. *Id*. at 11-12. It found "unpersuasive," Campbell's argument that a " 'turn signal is maintained in good condition if it works as the statute requires – clearly indicating an intention to change lanes, and visible from a distance of 300 feet from the front and back of the vehicle.' " *Id*. at 11 (quoting R 26 at 2). It reasoned a signal light does not have to "completely" fail to be not "in good working condition." *Id*. If "any functioning light . . . . satisfie[d] the statute's 'good working condition' requirement,' then the phrase "good working condition" would be superfluous. *Id*. at 12. Hence, the statute must requires something more than the signal's visibility from 300 feet. *Id*. Moreover, it found that any mistake of law on the part of McCannon in pulling Campbell for the fast blinking signal should not result in suppression because it was objectively reasonable.

The Court found no evidence created a "reasonable suspicion of criminal activity beyond the traffic violations . . . ." *Id*. at 14. It found, however, that "McCannon's questions unrelated to the traffic stop" did not measurably extend "the duration of the stop to make it unreasonable under the Fourth Amendment." *Id*. at 14-15. "Although Deputy McCannon was not required to complete a warning citation, he acted fully within his discretion to do so." *Id*. at 17. He was "entitled" to direct Campbell out of the vehicle and ask him "routine questions" about his

10

destination, route, and purpose. *Id*. The questions about a firearm, the year his car was made, and when he last received a ticket, "were authorized as questions that either addressed the traffic violation or were related to legitimate safety concerns." *Id*. The questions about his destination were not problematic because McCannon asked them "while [he] was writing the traffic citation." *Id*.

It found "most troubling" the officer's questions about counterfeit merchandise, drugs, and dead bodies. *Id*. at 17-18. Having found these questions extended the stop for 35 seconds, it nonetheless concluded this period did not "measurably extend" the stop within the meaning of *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). *Id*. at 20. It concluded *Rodriguez* did not alter the Eleventh Circuit's proscription against a "bright-line no prolongation rule." *Id*. at 18-19 (quoting *United States v. Griffin*, 696 F. 3d 1354, 1362 (11th Cir. 2012)). Because "the entire process" was "reasonable," the search did not violate the Fourth Amendment. *Id*. at 20.

## STANDARDS AND SCOPES OF REVIEW

A motion to suppress presents a mixed question of law and fact. *United States v. Alexander*, 835 F. 2d 1406, 1408 (11th Cir. 1988). This Court reviews the District Court's factual determinations for clear error and its legal conclusions *de novo*. *Id*.

## SUMMARY OF ARGUMENT

Point 1

The District Court erred in finding Officer McCannon's expansion of Campbell's traffic stop was constitutional because the overall process was reasonable. *Rodriguez*, 135 S. Ct. at 1606, made clear that the Fourth Amendment does not countenance *any* lengthening of a stop for reasons unrelated to its mission, which can be determined by observing "what the officer actually did and how he did it." The District Court should not have disregarded the time that elapsed when McCannon was asking questions unrelated to the mission of the stop, because the officer testified he stopped writing the warnings to ask them. It also erred in disregarding so-called "routine" questions about Campbell's route and destination. Even the thirty-five seconds the District Court did not discount "measurably extended" the stop without justification. *Arizona v. Johnson*, 555 U.S. 323 (2009). Because the court misapplied *Rodriguez*, this Court should reverse.

Point 2

The court erred in finding the rapidly blinking turn signal provided reasonable suspicion or probable cause to stop Campbell. Georgia law requires a turn signal to be visible from three hundred feet, but doesn't regulate the rate of blinking. *See* O.C.G.A. § 40-8-26. The court was wrong to read such a specification into the "good working order" requirement. If the signal began

13

blinking fast to indicate it would soon burn out, as the officer testified it did, then it was functioning like it should. The officer's mistake of law was not objectively reasonable under *Heien v. North Carolina*, 135 S. Ct. 530 (2014), because unlike the burned out brake light at issue in *Heien*, states do not customarily regulate the blinking rate of signals, and the officer could not reasonably misconstrue the statute governing turn signals to contain such a requirement.

## ARGUMENT AND CITATIONS OF AUTHORITY

**I.    Officer McCannon unconstitutionally expanded the stop without justification, contravening *Rodriguez v. United States*, 135 S. Ct. 1609 (2015).**

McCannon stopped the car because its turn signal "blinked too rapidly" and because it crossed the fog line twice. Although he did not investigate the failure to maintain the lane, he spent time investigating the car's other lights, Campbell's destination, his route of travel, his traffic and criminal record, and a laundry list of possible contraband items Campbell could have been carrying. In total, he detained Campbell without consent for 9 minutes 45 seconds, *see* video at 2:30-11:55, of which he spent about 7 minutes pulling him over and writing the two warnings. *See infra* at . He spent the remainder of the time on tasks unrelated to the purpose of the stop. This unconstitutionally expanded Campbell's detention.

The Supreme Court in *Rodriguez*, 135 S. Ct. 1609, changed its approach to evaluating the permissible scope of a traffic stop. It previously focused on the overall duration of the stop in considering whether suspicionless dog sniffs, *Illinois v. Caballes*, 543 U.S. 405 (2005), or irrelevant questioning, *Arizona v. Johnson* 555 U.S. 323 (2009), unconstitutionally expanded those seizures. Dicta in these cases foreshadowed its *Rodriguez* holding. In *Caballes*, 543 U.S. at 407 (italics added), the Court stated "a[] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is *prolonged beyond the*

15

*time reasonably required to complete that mission*." In *Johnson*, 555 U.S. at 333 (italics added), it stated "[a]n officer's inquiries into matters unrelated to justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, *so long as those inquiries do not measurably extend the duration of the stop*."

The Court held in *Rodriguez*, 135 S. Ct. at 1614, "[a]uthority for the seizure ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." This holding suggests two limits on the scope of a traffic stop. First, a court must determine when the "tasks tied to the traffic infraction are . . . completed" and then consider whether the officer extended the traffic stop for some unrelated and unjustified reason. Second, even if an officer immediately and unequivocally ends the stop upon completing the last task related to the traffic infraction, a court still must consider whether those tasks "reasonably should have been . . . completed" sooner. *Id.*

In deciding the first question – whether an officer impermissibly expanded a traffic stop after the "tasks tied to the traffic infraction are . . . completed" – a court does not have to consider whether the officer acted expeditiously in concluding the traffic investigation. *Id.* It could ignore everything the officer did during the traffic investigation, and even the overall duration of the traffic stop, and simply consider

what happened after that investigation ended, usually corresponding to the time the officer gives the ticket or warning to the driver.[3]

This is essentially what the District Court below did. Having disregarded the extraneous questioning that occurred "while McCannon was writing the traffic citation," R 32 at 17, the District Court found the 35 seconds that elapsed from the time McCannon began asking Campbell whether he possessed various contraband items to the time he obtained consent to search the car did not "measurably extend" the stop. *Id.* at 20 (quoting *Rodriguez*, 135 S. Ct. at 1615 (quoting *Johnson*, 555 U.S. at 333)). It concluded the "entire process" was "reasonable" under the Fourth Amendment. R 32 at 20.

The District Court's analysis suffers from three flaws: First, it erred in finding that McCannon's extraneous questions and actions that preceded his inquiries about contraband occurred "while [he] was writing the traffic citation." *Id.* at 17. The record established that when he asked Campbell questions, McCannon stopped writing the citation in order to look Campbell in the eyes. R 42 at 41, 46-47. The questioning thus extended the time it took for him to write the warnings.

---

[3] This straight-forward analysis would preclude "the well-known Lt. Columbo gambit ('one more thing . . .')." Wayne R. LaFave, *The "Routine Traffic Stop" From Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1898 (Aug. 2004).

17

Second, the District Court erred in concluding that McCannon's "routine questions such as the destination, route, and purpose of the stop" should not factor into whether the officer completed the stop expeditiously. *Id*. It held the officer was "authorized to ask" Campbell "routine questions" even if they were irrelevant to the purpose of the stop, citing the Fifth Circuit's opinion in *United States v. Brigham*, 382 F. 3d 500, 510 (5th Cir. 2009). R 42 at 17. There, the Fifth Circuit found "[a]n officer may . . . ask about the purpose and itinerary of a driver's trip during the traffic stop" because "[s]uch questions may efficiently determine whether a traffic violations has taken place, and if so, whether a citation or warning should be issued or an arrest made." *Brigham*, 382 F. 3d at 508. It additionally " 'reject[ed] the notion that a police officer's questioning, *even on a subject unrelated to the purpose of a routine traffic stop*, is itself a Fourth Amendment violation.' " *Id*. (quoting *United States v. Shabazz*, 993 F. 2d 431 (5th Cir. 1993)) (italics added in *Brigham*). It continued "'detention, not questioning, is the evil at which *Terry*'s second prong is aimed.'" *Id*.

*Brigham*, which predates *Rodriguez*, 135 S. Ct. 1609, is not persuasive. First, it is difficult to imagine how Campbell's route, destination, or his reason for going to Augusta could legitimately influence McCannon's decision as to whether to issue him a ticket or a warning for the traffic violations, unless the questioning uncovered an unrelated basis to arrest him. In that event the "routine questioning"

18

was a fishing expedition having nothing to do with how McCannon should respond to the traffic infractions. Second, the officers' questions about his travel plans were detailed and redundant, going beyond what could be considered routine. McCannon spent about 71 seconds asking Campbell about his Augusta destination. *See* video at 53:45 to 54:18 and 59:00 to 59:41.

As to the Fifth Circuit's assertion that questioning is not detention, any constitutional distinction between the two means little when the questioning prolongs the detention. Moreover, the Supreme Court has held that the duration is not the only measure of the permissible scope of a *Terry* stop. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) (holding "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop," and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.") Finally, to the extent the Fifth Circuit in *Brigham*, 382 F. 3d at 508, approved an officer's prolonging the stop to ask unrelated questions, *Rodriguez* now clarifies that an officer may not do so. Hence, if McCannon's questions were unrelated to the purpose of the stop, Campbell's extended detention was unlawful under *Rodriguez*.

This leads to the third flaw with the District Court's conclusion. By erroneously determining that McCannon asked unrelated questions while he wrote

the warnings, and that "routine questions" were authorized regardless of whether they extended the stop, the District Court did not seriously consider whether McCannon completed the traffic stop expeditiously, as *Rodriguez* requires. Instead, it applied the totality of the circumstances, finding "the entire process reasonable." R 42 at 20. It stated *Rodriguez* did not affect this Court's precedent discouraging "a bright-line no prolongation rule." R 42 at 19 (quoting *Griffin*, 696 F. 3d at 1362). But the *Rodriguez* holding was unequivocal. Writing for the majority, Justice Ginsburg stated "[h]ow could diligence be gauged other than by noting what the officer actually did and how he did it? If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.' " *Id.* (quoting *Caballes*, 543 U.S. at 407).

Hence the Court made clear that *any* unjustified extension of the stop means the officer did not pursue the stop expeditiously. "The critical question . . . is . . . whether conducting the sniff 'prolongs' – *i.e.*, adds time to – 'the stop.'" *Id.* at 1616 (internal citation omitted.) To faithfully apply *Rodriguez*, therefore, the District Court should have found the stop was illegal if any of McCannon's irrelevant questions and actions added time to the stop.

McCannon spent about 54 seconds investigating the fast blinking turn signal. *See* video at 3:49-4:43. He was not, strictly speaking, investigating whether Campbell's blinker violated the law. He was investigating whether a dying bulb or

20

some other electrical problem might have caused the rapid blinking. But, regardless of *why* it was blinking rapidly, he believed the signal was not in good working order.

He spent the next 23 seconds asking Campbell about his destination, and the reason he was traveling to Augusta. *Id.* at 4:44-5:09. He spent 26 seconds getting his citation book from his car, and later about 40 seconds retrieving his coat. *Id*. at 5:27-5:53, 7:50-8:30; *see* R 42 at 5. He asked Campbell about his driver's license and where he bought his car. *Id*. at 6. He again stopped writing to discuss Campbell's Augusta destination, this time for about 38 seconds. *See* video at 10:00-10:38. Finally, he spent 35 seconds asking Campbell the string of questions about possible contraband in his car. *Id*. at 11:15-11:50.

Each delay was measured in seconds, as the counter depicted on the video. For each second Campbell was detained against his will in cold weather late at night on the side of the road by armed officers, unable to walk away. These seconds added up. McCannon spent at least 162 seconds – two minutes and 42 seconds - asking questions or doing things unnecessary to accomplish the mission of the traffic stop, which was to confirm or deny that Campbell had violated the traffic law governing his turn signals and maintaining his lane, and to write him his warnings.

Even if the District Court was right to disregard all or most of the delays and focus only on the questions about contraband, it erred in concluding that "[t]he 35 seconds McCannon took to ask a few unrelated questions 'did not transform the stop into an unconstitutionally prolonged seizure.'" R 42 at 19 (quoting *Griffin*, 696 F. 3d at 1362). This conclusion overlooks the *Rodriguez* Court's explicit refusal to authorize even a *de minimis* extension of a traffic stop for reasons unrelated to its mission.

The Court's rejection of the Eighth Circuit's "*de minimis* rule" is unsurprising. *Rodriguez*, 135 S. Ct. at 1615. The Court has repeatedly used unequivocal language in stating that an unjustified expansion of a seizure is impermissible, however brief. In *Warden v. Hayden*, 387 U.S. 294, 310 (1967) (italics added), it held that any warrantless search or seizure must be "*strictly* tied to and justified by the exigencies which" authorized dispensing with the warrant requirement. In *Royer*, 460 U.S. at 500 (italics added), it stated a seizure "must be temporary and last *no* longer than is necessary to effectuate the purpose of the stop . . . ." In *Meuhler v. Mena*, 544 U.S. 93, 101 (2005), it found roadside questioning unrelated to the reason for the stop did not offend the Fourth Amendment only because the questions did not extend the duration of the stop. Again, in *Caballes*, 543 U.S. at 408, it suggested a traffic stop "prolonged beyond the time reasonably required to complete th[e] mission" was unlawful. And in *Johnson*, 555 U.S. at

333, it stated that irrelevant questions which "measurably extend" a traffic stop made the stop unlawful.

In sum, the District Court should have "gauge[d]" when the "tasks tied to the traffic infraction . . . reasonably should have been – completed," based on "what the officer actually did and how he did it." *Rodriguez,* 135 S. Ct. at 1614, 1616. Although it made detailed findings about "what the officer actually did and how he did it," the District Court nonetheless found "the entire process reasonable," implying that any unjustified delay was *de minimis*. Because the record shows that McCannon "measurably extended" Campbell's traffic stop by anywhere from 35 to 225 seconds, for reasons unrelated to confirming or denying the traffic violation and unnecessary to complete the warnings, and because *Rodriguez* precludes *any* unjustified extension of the stop, the District Court should have suppressed the gun as the fruit of an unlawful seizure. *Johnson*, 555 U.S. at 333.

## II.    McCannon did not have reasonable suspicion or probable cause to stop the car based on the turn signal blinking "too rapidly."

A police officer does not have reasonable suspicion or probable cause to stop a car when its turn signal blinks "too rapidly." The Georgia statute governing turn signals does not regulate the meter at which a blinker should blink, as long as the blinking "clearly indicat[es]" the driver's "intention to turn either to the right or to the left," and is "visible and understandable during daytime and nighttime from a distance of 300 feet from both the front and the rear." O.C.G.A. § 40-8-26(a)(2),(b).

Nor does fast blinking violate the requirement that turn signals "be maintained in good working condition." O.C.G.A. § 40-8-26(b). Even if McCannon was correct in speculating that the fast blinking indicated a bulb would soon go out, it was not out when he pulled Campbell. In fact, if the fast blinking was intended to warn Campbell that he would soon need to change a bulb, it was working exactly as it was designed.

No Georgia precedent supports the District Court's finding that the fast blinking gave McCannon reasonable suspicion or probable cause to stop Campbell. Rather, the courts have approved traffic stops based on lights that do not illuminate at all. *See Stubbs v. State*, 387 S.E.2d 619 (Ga. Ct. App. 1989) (turn signal); *Barnett v. State*, 620 S.E.2d 663 (Ga. Ct. App. 2005) (headlight); *Navicky v. State*, 537 S.E.2d 740 (Ga. Ct. App. 2000) (tag light); *Warren v. State*, 561 S.E.2d 190,

194 (Ga. Ct. App. 2002) (back up lights); *Lancaster v. State*, 582 S.E.2d 513 (Ga. Ct. App. 2003) (brake light).

The District Court reasoned that problems short of a light's "complete failure" can also provide reasonable suspicion that the light was not in "good working condition." R 32 at 11-12. Indeed, one can imagine circumstances short of "complete failure" – perhaps if the blinker bulb were hanging by its wires – which would provide reasonable suspicion that the light was not in "good working condition." But "fast blinking" indicates the bulb will cease to be in "good working condition" in the future, not that it is presently not working.

The District Court found unpersuasive Campbell's argument that the rapidly blinking light was in good working condition because it clearly indicated his intention to change lanes at 300 feet, because so limiting the turn signal requirements would render the "good working condition" language of section 40-8-26(b) superfluous. *Id*. at 12. But extrapolating from the "good working condition" language some unstated specifications is speculative. The Georgia Legislature stated in detail the conditions for a legally functioning turn signal. The "good working condition" language rests in the middle of a paragraph that details the turn signal's specifications. If the Legislature meant to regulate the rate at which turn signals blink, it could have articulated and highlighted this obligation. Rather than holding the "good working condition" phrase necessarily imposes

25

some unspoken requirement separate from the statutory specifications for turn signals, the district court should have interpreted each part of section 40-8-26 harmoniously. Accordingly, a turn signal that "clearly indicates" a driver's intention to turn from 300 feet away and from the front and the back is in "good working condition."

At least, a turn signal's blinking rapidly (but steadily) does not indicate otherwise. As such, it does not provide even reasonable suspicion that the turn signal *might* not be in "good working condition." Again, based on McCannon's explanation, which drew from his experience working on cars, turn signals begin to blink fast *before* they fail. Like most lightbulbs, the signal is in "good working condition" until it fails. It works until it stops working. Because Campbell's signal worked, McCannon could not stop him for it.

The District Court further concluded "even if McCannon was mistaken that the rapidly-blinking signal light violated the 'good working condition' requirement under O.C.G.A. § 40-8-26, such a mistake of law is reasonable," citing *Heien v. North Carolina*, 135 S. Ct. 530 (2014). There, the Court held that a traffic stop based on an officer's reasonable mistake of law was valid. *Id*. at 534. "The limit," the Court explained, "is that 'the mistakes must be those of reasonable men.' " *Id*. at 536 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). But the

26

officer's mistake in *Heien* was much more understandable than McCannon's mistake.

The officer in *Heien*, 135 S. Ct. at 534, pulled a car because one brake light did not illuminate at all. He believed that North Carolina statute required two functioning brake lights, when in fact it only mandated one. *Id*. at 535. This mistake was objectively reasonable. The officer might have thought it common sense that an obviously non-illuminating brake light warranted a ticket or warning. Driving with any type of burned out light in most jurisdictions usually violates a traffic law. Moreover, a cursory reading of the North Carolina statute might have supported this mistaken belief:

> Although the North Carolina statute at issue refers to "a stop lamp," suggesting the need for only a single working brake light, it also provides that "[t]he stop lamp may be incorporated into a unit with one or more other rear lamps." N.C. Gen.Stat. Ann. § 20–129(g) (emphasis added). The use of "other" suggests to the everyday reader of English that a "stop lamp" is a type of "rear lamp." And another subsection of the same provision requires that vehicles "have all originally equipped rear lamps or the equivalent in good working order," § 20–129(d), arguably indicating that if a vehicle has multiple "stop lamp[s]," all must be functional.

*Id*. at 540.

Here, whether Georgia statute required one, two, or four signals, nothing in the statute alluded to how fast the blinker blinked. No vague reference to some arguably applicable subsection could suggest to McCannon that the law regulated

27

this feature of the turn signal. Nor is it customary for officers to give tickets based on lights blinking too fast.

According to McCannon, he was drawing from his own personal experience with car lights in concluding the blinker might soon fail. But "[t]he Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes – whether of fact or of law – must be *objectively* reasonable." *Id*. at 539 (italics in original.) McCannon's personal experience with automobile maintenance should not factor into how reasonable his mistake was. This experience is irrelevant to the statutory requirements and cannot ground an *objectively* reasonable understanding of the statute. Thus, the District Court erred as a matter of law in concluding the officer could stop a car because its turn signal blinked too fast, or that the officer's mistake on this point was objectively reasonable.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's order denying Campbell's motion to suppress, reverse Campbell's conviction and sentence, and remand to the District Court for any further proceedings.

Dated this 22nd day of July, 2016.


*s/ Jonathan Dodson*
JONATHAN DODSON
FL State Bar No. 50177
Appellate Counsel for Mr. Erickson Meko Campbell
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 207-3443; Fax: (478) 207-3419
E-mail: jonathan_dodson@fd.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I, Jonathan Dodson, appellate counsel for Mr. Erickson Campbell, hereby certify that the number of words in this brief, as counted by the Microsoft Office Word 2007-processing system, according to the method described in Eleventh Circuit Rule 32-4, is **5,785** words; which is less than the 14,000 allowed for appellate briefs by Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

## CERTIFICATE OF SERVICE

I, Jonathan Dodson, appellate counsel of record for the Appellant, Mr. Erickson Campbell, hereby certify that I have, on this 22nd day of July, 2016, filed the foregoing *Principal Brief of the Appellant* with the Clerk of Court using the Eleventh Circuit's CMECF system, which will send electronic notification of filing to counsel of record.

I also certify that I caused a copy of the foregoing *Principal Brief of the Appellant* to be served in paper format upon the following, by placing a copy of the same in the United States Mail, postage prepaid, addressed to: Mr. Erickson Meko Campbell, 95 Pleasant Valley Road, McDonough, Georgia 30523.

I further certify that, on the date set forth above, I caused the foregoing submission to be dispatched for filing with the Clerk of Court by Federal Express overnight delivery.

*s/ Jonathan Dodson*
JONATHAN DODSON
FL State Bar No.  0050177
Appellate Counsel for Mr. Erickson Meko Campbell
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel:  (478) 207-3443; Fax:  (478) 207-3419
E-mail:  jonathan_dodson@fd.org